UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **JILL DUCAT AND DOUGLAS DUCAT,** <br> **Plaintiffs,** <br><br> v. <br><br> **ETHICON, INC.,** <br> **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **CIVIL ACTION** <br> **NO.  4:21-cv-10174-TSH** |

## ORDER ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
### (Docket No. 13)

**APRIL 14, 2021**

**HILLMAN, D.J.,**

    Jill and Douglas Ducat ("Plaintiffs") filed this action against Ethicon, Inc. ("Defendant") for negligent design (Count I), violation of the implied warrant of merchantability (Count II), and loss of consortium (Count III) in Worcester Superior Court.  Defendant removed the action to this federal court.  Plaintiffs allege that Defendant designed and manufactured a defective vaginal mesh product whose surgical insertion into Jill Ducat in 2003 caused mesh erosion; heavy, chronic vaginal bleeding; pain; and vaginal injuries.  As a result, Ms. Ducat's quality of life has been compromised and she has endured multiple painful surgical interventions.  Defendant moves for judgment on the pleadings.

    Because Plaintiffs have not alleged the existence of a safer alternative design, which is required for both their contract and tort claims, Plaintiffs are given leave to amend.

## Facts

Jill Ducat underwent a paravaginal anterior repair surgery in May 2003 to treat uterine and pelvic organ prolapse. (Comp. ¶ 6-7, Docket No. 1). The surgeon attached Gynecare Gynemesh PS Prolene ("Gynemesh"), a medical device produced by Defendant, to Plaintiff's anterior vaginal wall using vicryl sutures. (¶ 8). Over the following seventeen years, Plaintiff experienced recurrent bouts of vaginal mesh erosion, which caused pain, heavy bleeding, vaginal injuries, and required repetitive painful surgical interventions. (¶¶ 8-22). At times, Plaintiff could not "engage in much, if any, activity;" she also abstained from sexual activity due to the bleeding, which impacted her relationship with her husband, co-Plaintiff Douglas Ducat. (¶¶ 21-22). She experienced chronic, heavy vaginal bleeding from 2017 until about May 2020. (¶ 20).

From 2003 to 2005, Plaintiff experienced discomfort until a mesh erosion revision surgery was performed, but the mesh erosion recurred by June 2005. (¶ 8). A physical examination at St. Vincent Hospital revealed approximately five millimeters of Gynemesh was visible "at the apex of the paravaginal area on her left side." (¶ 9). A second surgery to re-open Plaintiff's anterior vaginal wall was performed so that the scar, mesh, and fascia could be dissected and excised off Plaintiff's left side; residual mesh from the right side was also removed. (*Id.*). After this procedure, Plaintiff did not exhibit symptoms for over a decade. (¶ 10).

On or about August 2017, Plaintiff began to experience heavy, chronic vaginal bleeding and returned to St. Vincent's for treatment, where, for a second time, doctors found Gynemesh visibly protruding from the left mid sulcus of Plaintiff's vagina. (¶ 11). From August 2017 to August 2018, Plaintiff sought treatment from multiple healthcare providers, including a urogynecologist. (¶ 12). During this period, she "underwent at least two vaginal mesh excisions, and multiple, painful in-office cauterizations in an effort to decrease or stop the bleeding." (*Id.*).

Her treatment options were complicated by the fact that removal of all the mesh risked harming her other internal organs and tissue. (¶ 13).

Plaintiff's daily vaginal bleeding continued. In December 2018, a physician determined that she "has persistent vaginal wound separation that resulted in abundant bleeding with the passage of large clots per vagina. Prior physicians have tried primary repairs to reapproximate the defect only to have the wound further separate and lead to prolonged bleeding." (¶ 14). Plaintiff underwent an unsuccessful procedure for the installation of a decelluralized dermis allograft; during that operation her surgeon discovered "a 2 x 3 centimeter defect along the left apical border of her vagina, with one centimeter granulation tissue." (¶ 15).

Following the December 2018 procedure, Plaintiff had two additional surgeries to remove the Gynemesh in June 2019 and May 2020. (¶¶ 17-19). She has not experienced any bleeding since the May 2020 procedure but worries that "the chronic bleeding could resume at any time." (¶ 23).

## Legal Standard

This Court reviews motions for judgment on the pleadings under a standard that is essentially the same as that for a motion to dismiss under Fed. R. Civ. P. 12(b)(6), except that "[a] Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole." *Aponte–Torres v. Univ. of P.R.*, 445 F.3d 50, 54-55 (1st Cir. 2006). Thus, the court views "the facts contained in the pleadings in the light most favorable to the party opposing the motion . . . and draw[s] all reasonable inferences in [that party's] favor." *Curran v. Cousins*, 509 F.3d 36, 43 (1st Cir. 2007). Dismissal is only appropriate if the pleadings, viewed in the light most favorable to the non-moving party, fail to support a "plausible entitlement to relief." *Kimmel & Silverman, P.C. v.*

*Porro*, 969 F. Supp. 2d 46, 49-50 (D. Mass. 2013) (citing *Rodriguez–Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007)).

## **Discussion**[1]

### *Count I. Negligence—Design Defect*

"Proof of design negligence requires satisfaction of the following three elements: (1) the manufacturer's failure to exercise a reasonable degree of care under the circumstances; (2) proximate causation; and (3) injury and/or loss." *Geshke v. Crocs, Inc.*, 889 F.Supp.2d 253, 261 (D. Mass. 2012). "In claims alleging negligence in the design of a product, as with claims of a design defect in breach of the implied warranty of merchantability, the plaintiff must show "an available design modification which would reduce the risk without undue cost or interference with the performance of the [product],' and the jury must consider whether a safer alternative design was available in deciding whether the defendant was negligent for failing to adopt that design." *Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 443-44 (Mass. 2013).

Defendants argue that Plaintiffs' negligent design claim must be dismissed because Plaintiffs have not alleged facts showing how the design of the mesh was unsafe and what purported design defect caused Plaintiff's injuries, and because they did not plead the existence of a safer alternative design.

Defendants contend that Plaintiffs have not alleged facts showing how the design of Gynemesh is unsafe or how Plaintiff's alleged injuries trace to any design features of Gynemesh. At the 12(b)(6) stage, the Court takes all well-pleaded allegations as true and draws all reasonable

---

[1] In their opposition to the motion for judgment on the pleadings, Plaintiffs clarified that they are not pleading a manufacturing defect, so my focus will be limited to whether Plaintiffs' have alleged viable claims for design defect, the implied warranty of merchantability, and loss of consortium in their pleadings. (*See* Docket No. 20 at 3, n. 1).

4

inferences in the Plaintiffs' favor. Plaintiff have stated a colorable claim that the design of the Gynemesh was unsafe. Plaintiffs have credibly alleged that the Gynemesh implanted into Plaintiff's anterior vaginal wall began to erode or detach, such that not one, but two physicians observed that the mesh, which was once inside her vagina, had moved, and was visibly protruding outside of her vagina. The ease and pace of erosion or disintegration of the mesh is the alleged defect; it caused such heavy bleeding that physicians performed numerous invasive surgical procedures to repair it, including excising the mesh, scar, and fascia, *and even cauterizing Plaintiff's vaginal tissue to stop the bleeding*.

Over the past decade, there have been tens of thousands of surgical mesh product liability cases filed in federal courts, and Defendants point to the dismissal of a handful of those cases in other districts as evidence that Plaintiff's factual allegations about the cause of Plaintiff's injuries and the dangerous nature of the product are too scant to state a claim against Gynemesh. However, I find these unconvincing. For example, the dismissed plaintiff in *Meredith v. Medtronic* failed to show that his hernia repair mesh causes his injuries. *See* 2019 WL 6330677 at *4 (S.D. Iowa Oct. 25, 2019) (applying Iowa law, which has similar design defect liability standards stemming from the Restatement of Torts). Here, Plaintiff provided an abbreviated medical history, her physicians' findings, described how the vaginal mesh migrated and caused heavy bleeding, and stated that specific surgical interventions were performed to address the problem. And, the dismissed plaintiff in *Baca v. Johnson & Johnson* did not "describe how the Product implanted in Plaintiff failed," instead listing her medical procedures. *See* 2020 WL 6450294 at *2-3 (D. Az. Nov. 2, 2019) (applying Arizona product liability law, also similar to Massachusetts law).

With respect to Plaintiff's failure to plead the existence of a safer alternative design, "[a]n essential element of . . . a design flaw claim is that there be a safer alternative design." *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 26 (1st Cir. 2004).

To be sure, there is some ambiguity in Massachusetts law—which both parties agree controls these claims—concerning whether a plaintiff must prove the existence of a reasonable alternative design to prevail on a negligence defective design claim.

Like many states, Massachusetts has moved away from the consumer expectations test and adopted a risk-utility approach to defective product claims, which is set out in the Third Restatement of Torts. *Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 424 (Mass. 2013) ("In short, in determining whether a product's design is unreasonably dangerous, we have been applying a risk-utility balancing standard . . . since well before the Third Restatement articulated this liability standard."). Under that standard as applied in Massachusetts, "whether a product is unreasonably dangerous depends on multiple factors, including 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Id.* at 427 (citing *Haglund v. Phillip Morris*, 446 Mass. 741, 748 (2006), which in turn cited *Back v. Wickes Corp.*, 375 Mass. 633, 642 (Mass. 1978); under *Back*, the SJC implied that a safer alternative design was one of a list of factors a jury must weigh to determine design defect liability: "[i]n evaluating the adequacy of a product's design, the jury should consider, among other factors, 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved

6

design, and the adverse consequences to the product and to the consumer that would result from an alternative design.').

For the first time in *Evans*, the SJC departed from its prior jurisprudence and stated unambiguously that "[t]o establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." *Id*. at 428 (citing *Uloth v. City Tank Corp.*, 376 Mass. 874, 881 (1978) ("there is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery")). Under *Evans*, it would seem clear that proving a safer alternative design exists that is, per the third, fourth, and fifth *Back* factors, reasonable when considering cost, mechanical feasibility, and adverse consequences to the product and consumer is a required element to recover for design defect, and so Plaintiff's failure to plead that such an alternative design for Gynemesh existed does not comply with *Twombly*'s rule that pleadings must "nudge" claims "across the line from conceivable to plausible" to avoid dismissal. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The confusion arises because *Evans*' interpretation that *Uloth* and *Back* require a plaintiff to prove the existence of a reasonable alternative design overstates the holdings in both those cases and ignores another key precedent. *Back* established a balancing test of five factors where no factor is singled out as dispositive, and the first two factors (the gravity of the danger, and the likelihood that the danger would arise) have nothing to do with an alternative design. *Back v. Wickes Corp.*, 375 Mass. 633, 642 (Mass. 1978). Complicating this picture, the same day that the SJC issued *Back*, it issued *Smith*, in which it held a snowmobile maker liable for design defect even where the plaintiff had not pleaded or presented any evidence of a reasonable alternative

design at trial. *Smith v. Ariens*, 375 Mass. 620, 625 (1978) (finding that evidence presented to the jury, including the existence and placement of metal protrusions on the snowmobile's handlebars and the absence of guards to cover them, was sufficient for the jury to find the product was negligently designed, especially because the danger was within the scope of the average juror's knowledge). In *Uloth*, decided five months after *Back*, the SJC pronounced that "there is a case" for design defect if a design modification would have reduced the risk without undue cost or interference, even where a product performs as intended, contains adequate warnings, or whose dangers are obvious. *Uloth* at 881. *Uloth* held that a reasonable alternative design could be sufficient to prove design defect, but not that it was necessary. *Id.* *Uloth* and *Evans* did not discuss *Smith* and the SJC has never repudiated *Smith*, which leaves open the question of whether a plaintiff can still prevail for design defect on the first two *Back* factors without proposing and proving an alternative design under Massachusetts law.

The First Circuit acknowledged this unresolved issue in *Osorio v. One World Technologies*, 659 F. 3d 81, 86-7 (1st Cir. 2011) (finding that SJC precedent in *Smith*, 377 N.E. 2d at 957, "suggests that Massachusetts product liability law may tolerate a finding of design defect even in the absence of evidence supporting the existence of a feasible alternative design."). In that case, Osorio claimed that his injury from a table saw could have been prevented if the defendant had included a SawStop device that would stop the saw's motion when the blade came into contact with human flesh; after trial, defendant moved for judgment as a matter of law because the plaintiff had not proven that incorporating SawStop, which would make the table saw larger, heavier, and more expensive, was a reasonable alternative design for the table saw at issue under *Back*. *Id*. at 84-5. The district court denied the motion. *Id*. There, the First Circuit held it was the jury's province to do the cost/benefit analysis and decide whether SawStop was a reasonable

alternative design. *Id*. at 86. It also pointed to *Smith*, finding that *Smith* "suggests that Massachusetts product liability law may tolerate a finding of design defect in the absence of evidence supporting the existence of a feasible alternative design." *Id*. at 87. Significantly, *Osorio* predates *Evans*, in which the SJC first clearly stated that an alternative design was a required element under its prior case law.

In *Tersigni*, the First Circuit considered *Smith* and *Evans* and found that under Massachusetts law "the plaintiff must offer proof of an available design modification of "*the product,*" and held that summary judgment was properly entered where the plaintiff could not offer proof of a reasonable alternative design. *Tersigni v. Wyeth*, 817 F.3d 364, 368-69 (2016). Unlike Osorio, Terisini had not contended before the District Court that a reasonable alternative design existed which would have made its product, a weight loss drug which allegedly caused a dangerous condition called primary pulmonary hypertension, less dangerous. The First Circuit concluded that "Terisgni's claim fails because he cannot offer proof of a reasonable alternative design, *as Massachusetts law plainly requires*." *Id.* at 369 (*emphasis added*). *Tersigni* cited *Smith*, but only to show that Massachusetts provides a cause of action for negligent design of consumer products and has eschewed a strict liability approach. *Id*. at 367-68.

Plaintiffs object that, per *Smith*, Massachusetts law does not require them to plead the existence of a safer alternative design. They rely heavily on *Taupier*, where a court in this District denied a motion to dismiss a negligent design claim where the plaintiff did not plead the existence of an alternative design and cited *Smith* and *Osorio*. *Taupier v. Davol, Inc.*, 490 F.Supp.3d 340 (D. Mass. 2020). *Taupier* relied on the First Circuit's observation in *Osorio* that the *Smith* route to proving design defect without an alternative design is still good law, and "[w]here the First Circuit has said that a plaintiff may not be required to prove the existence of a safer alternative

9

design to prevail on a negligent design claim, the absence of such an alternative in the First Amended Complaint. . . is not a basis for dismissal." *Id*. at 446. Inexplicably, the *Taupier* Court omitted any discussion of *Tersigni* and *Evans*, which postdate *Osorio*.

It is difficult to square *Osorio*'s statement that *Smith* allows for design defect liability without proving a reasonable alternative design with the more recent cases, *Tersigni* and *Evans*. This conundrum likely resulted in the denial of dismissal in *Taupier*. However, I read *Evans*, and the First Circuit's references to *Evans* in *Tersigni*, to mean that the SJC has adopted the Third Restatement's requirement that "to establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." *Evans* at 428 (citing the Third Restatement of Torts § 2 at 24, comment f (1998)). Because a reasonable alternative design is a required element of design defect and Plaintiffs have not pled that an alternative design exists in their Complaint, they have not stated a plausible claim for relief, and so Count I must be dismissed or the Plaintiffs must be given leave to amend.

### *Count II. Implied Warranty of Merchantability*

A merchant who sells goods implicitly warrants that their goods "are fit for the ordinary purposes for which such goods are used." M.G.L. c.106 § 2-314(2)(c). Liability is "fully as comprehensive as the strict liability theory of recovery that has been adopted by a great many other jurisdictions." *Id.* (citing *Back v. Wickes Corp.,* 375 Mass. 633, 639 (Mass. 1978)). "A seller breaches its warranty obligation when a product that is "defective and unreasonably dangerous, for the "[o]rdinary purposes for which it is "fit" causes injury. *Evans* at 422. "Ordinary purposes" refers to a product's intended and foreseeable uses.

Warranty liability may be based on failure to warn or, as here, a design defect. *Haglund v. Phillip Morris*, 446 Mass. 741, 747 (2006). When warranty liability is alleged based on design defect, it follows the same standard of proof as a negligence claim based on design defect. *Evans* at 443-44. That is, "the plaintiff must show "an available design modification which would reduce the risk without undue cost or interference with the performance of the [product],' and the jury must consider whether a safer alternative design was available in deciding whether the defendant was negligent for failing to adopt that design." *Id*.

As an initial matter, for the purposes of this preliminary motion neither party denies that Defendant was the merchant who manufactured sold Plaintiff the allegedly defective mesh, or that Plaintiff used the mesh for its intended and foreseeable uses when it was surgically implanted in her vagina. As discussed above, I have already found that Plaintiffs have stated a claim that the Defendant's mesh caused her injuries. Therefore, whether Plaintiffs' warranty claims survives depends on whether they have stated a claim for design defect under Evans.

Just as Plaintiffs' negligence design defect claim failed for not alleging the availability of a safer or reasonable alternative design, *supra* Count I, so too must Plaintiffs' implied warranty of merchantability claim, as presently constituted.

### Count III. Loss of Consortium

"As a general rule, a claim for loss of consortium requires proof of a tortious act that caused the claimant spouse's personal injury." *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994). Because Count III is not an independent cause of action, whether Mr. Ducat's loss of consortium claim survives will depend on whether this case lives should Plaintiffs decide to amend the Complaint.

## Conclusion

For the reasons set forth above, the Plaintiffs are given leave to amend their Complaint. They shall be given 21 days to file an Amended Complaint from the date of entry of this Order. Failure to file an Amended Complaint within the time provided will result in the dismissal of the Complaint for the reasons set forth above.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
