**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JILL DUCAT, ET AL.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No. 4:21−cv−10174−MRG** |
| ) | |
| **ETHICON, INC.** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**GUZMAN, J.**

For the reasons stated on the record and those detailed below, the Court GRANTS

Ethicon's Motion for Summary Judgment, ECF No. 75, and the case is DISMISSED.

### I.     Introduction and Procedural History

Plaintiffs Jill and Douglas Ducat brought this products liability case against Defendant,

Ethicon, Inc. ("Ethicon"), regarding its pelvic mesh product, Gynecare Gynemesh®

("Gynemesh"). Ms. Ducat received surgery to implant Gynemesh and later experienced negative

health outcomes that she attributes to defects in the Gynemesh product.  The Ducats filed suit

against Ethicon in Worcester Superior Court on November 13, 2020, alleging negligent design,

breach of implied warranty of merchantability, and loss of consortium.  [Original Compl., ECF

No. 1-3].   Ethicon removed the case to this Court on February 1, 2021. [Notice of Removal,

ECF No. 1].   Plaintiffs amended their complaint on May 6, 2021. [Am. Compl., ECF No. 36].

Ethicon filed a motion for summary judgment on March 9, 2023. [Mot. Summ. J., ECF No. 75].

The Court heard oral argument on the motion on August 18, 2023, [ECF No. 93], and ruled that

the Ducats' claims are barred by the statute of limitations. This memorandum and order further sets out the Court's reasoning as applied from the bench.

**II.    Factual Background**

In late 2002, Ms. Ducat had a medical consultation for ovarian cysts and irregular menses. [Pls.' Mem. 2, ECF No. 82]. After a diagnostic hysteroscopy, she was diagnosed with uterine prolapse and pelvic organ prolapse. [Id.] In May 2003, Ms. Ducat's surgeon, Dr. Andrea Pezzella, performed a hysterectomy and paravaginal repair, using Gynemesh for structural support. [May Operative Report, ECF No. 76, Ex. B]. On May 12, 2004, Ms. Ducat returned to Dr. Pezzella reporting that "she was having painful intercourse. Her husband stated that something is cutting him when he goes inside." [Pezzella Dep. 65:2-4, ECF No. 76, Ex. C; Medical Record, ECF No. 76, Ex. D]. Dr. Pezzella examined Ms. Ducat and recommended excision of the part of the mesh that had migrated through the vaginal wall, to which Ms. Ducat consented, and the surgery was performed. [Pezzella Dep. 68:4-6; Consent 5.12.04, ECF No. 76, Ex. E].

One year later, on June 6, 2005, Ms. Ducat returned to Dr. Pezzella with recurrent complaints of painful intercourse and that her husband was experiencing scratching during intercourse. [Pezzella Dep. 79:21-23]. Upon inspection, Dr. Pezzella noted further migration of the mesh and recommended a second excision of the mesh, to which Ms. Ducat consented, and the surgery was performed. [Pezzella Dep. 81:13-16; Consent 6.6.05, ECF No. 76, Ex. J]. After the second mesh removal, Ms. Ducat's original symptoms abated. [Pls.' Mem. 4].

Between 2008 and 2011, the FDA issued two public health notifications regarding pelvic mesh products. [Def.'s Mem. 9, ECF No. 77]. The first, issued in October 2008, was addressed to healthcare providers, and warned of serious complications related to pelvic mesh including

erosion, infection, pain, urinary problems, and pain with intercourse. [10.20.08 FDA POP and SUI Notice, ECF No. 76, Ex. L].   The second, issued in July 2011, was addressed to both healthcare providers and patients who had received pelvic mesh products. [7.13.11 FDA POP Notice, ECF No 76, Ex. M]. This updated notification warned that complications associated with pelvic mesh prolapse repair are not rare and that patients experiencing complications after surgery (including painful intercourse) should notify their healthcare provider. [Id.]

In August 2017, Ms. Ducat experienced heavy, chronic, vaginal bleeding. [Am. Compl. ¶¶ 9]. From August 2017 to May 2020, Ms. Ducat underwent multiple surgical procedures to address these new complications and there was further removal of the visible Gynemesh product. [Id. ¶¶ 9-19].   Ducat contends that only then did she first suspect that the Gynemesh implanted in 2004 was a potential source of her problems. [Pls.' Mem. 4].

### III.   Legal Standard

#### A.   Summary Judgment

A court may grant summary judgment when, making all inferences in favor of the nonmoving party, the evidence in the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Gattineri v. Wynn MA, LLC, 63 F.4th 71, 84-85 (1st Cir. 2023) (quoting Fed. R. Civ. P. 56(a)). "An issue is 'genuine' when a rational factfinder could resolve it either direction." Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010)). "A fact is 'material' when its (non)existence could change a case's outcome." Mu, 882 F.3d at 5 (quoting Borges, 605 F.3d at 5).   To show a genuine dispute, the nonmoving party must "present affirmative evidence" rather than "rest upon mere allegation or denials of his pleading." N.Y. Life Ins. Co. v. Mabardy, No. 22-11126-FDS, 2023 U.S. Dist. LEXIS 111255, at

\*4-5 (D. Mass. June 27, 2023) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57 (1986)). To survive summary judgment, the nonmoving party must provide evidence that is "significantly probative" and more than "merely colorable." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-55 (1986).

**B.  <u>Statute of Limitations</u>**

This case is before the Court under diversity jurisdiction. [Am. Compl. ¶ 1-3]. In federal diversity cases, "state law supplies the substantive rules of decision." <u>Gattineri</u>, 63 F.4th at 84 (citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938)). Massachusetts law proscribes "actions of tort . . . shall be commenced only within three years next after the cause of action accrues." MASS. GEN. LAWS ch. 260, § 2A. Massachusetts does not define when a cause of action accrues by statute, so the Massachusetts Supreme Judicial Court ("SJC") uses a "discovery rule" that calculates when the statute of limitations begins in a tort action. <u>Hendrickson v. Sears</u>, 365 Mass. 83, 83-84 (Mass. 1974). The SJC established that notice is required before a plaintiff's claims are time barred, however, notice begins when a plaintiff learned or should reasonably have learned that they were harmed by the defendant's conduct. See <u>Olsen v. Bell Tel. Laboratories, Inc.</u>, 388 Mass. 171, 174-75 (Mass. 1983); <u>Bowen v. Eli Lilly & Co.</u>, 557 N.E.2d 739, 741 (Mass. 1990).

Accordingly, under the discovery rule, the statute of limitations does not begin to run until a "reasonably prudent person" in the plaintiff's position has (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of the harm was. <u>Bowen</u>, 557 N.E.2d at 742; <u>see also</u> <u>Fidler v. Eastman Kodak Co.</u>, 714 F.2d 192 (1st Cir. 1983) (holding that notice include not only knowledge of injury but also knowledge of cause). "Whether a plaintiff has knowledge or notice of her injury and the causes of her injury is

determined by using a reasonable person standard." <u>DeLellis v. Johnson & Johnson</u>, No. 20-11665-MLW, 2021 U.S. Dist. LEXIS 144441, at *13 (D. Mass. July 26, 2021) (citing <u>Riley v. Presnell</u>, 565 N.E.2d 780, 785-86 (Mass. 1991)). Therefore, "even if a plaintiff does not subjectively know of her injury or the cause of her injury, if circumstances exist such that the plaintiff reasonably should have known, then the statute of limitations is not tolled by the discovery rule." <u>Id.</u> Knowledge of a likely cause of injury is ordinarily enough to start the statute of limitations and triggers a duty for the plaintiff to discover from legal, scientific, and medical communities whether her "theory of causation is supportable and whether it supports a legal claim." <u>Fidler</u>, 714 F.2d at 199.

The discovery rule applies to product liability actions brought under a negligence or breach of warranty theory, as is the case in this action. <u>Id.</u> at 197. In the products liability context, a plaintiff is on notice when she knew or reasonably should have known that she has been harmed by the defendant's *product*. <u>Id.</u> at 199. But the standard does not require that the plaintiff know that she has been harmed by the defendant's alleged breach of a legal duty, i.e., that the defendant's product is defective. <u>Id.</u>

IV.   <u>Discussion</u>

A.   <u>Potential Dates of Notice</u>

The central question before the Court is whether Ms. Ducat knew or should have known she was harmed, and that the harm was caused by the Gynemesh, within three years of the filing of her complaint on November 13, 2020. Ethicon asserts that Ms. Ducat was on notice and the statute of limitations began tolling either after seeing her physician in 2004 and 2005, or when the FDA issued its public health notices regarding vaginal mesh products in 2008 and 2011. If

the statute of limitations began running on any of these dates, Plaintiffs' action would be untimely by more than six years and, thus, time barred. MASS. GEN. LAWS ch. 260, § 2A.

Plaintiffs respond that Ms. Ducat had no reason to believe that her medical problems were caused by a defect in the Gynemesh and claim that Dr. Pezzella never stated that Ms. Ducat's complications were caused by the Gynemesh. [Pls.' Mem. 7-13]. Ms. Ducat further claims that because she experienced no further complications after her 2005 surgery, she had no reason to keep up to date with regulatory notifications relating to Gynemesh, and, therefore, the FDA notifications did not put her on notice. [Id. at 13]. Instead, Plaintiffs assert that Ms. Ducat was only on notice when new symptoms appeared in the fall of 2017, making her November 13, 2020 complaint timely filed. [Id. at 4].

### B.  Plaintiffs' Claims are Barred by the Statute of Limitations

The Court finds that Plaintiffs' claims are barred by the statute of limitations because Ms. Ducat was or should have been on notice that she had been harmed and that Gynemesh was the cause of her harm either after her 2005 appointment, or, in the alternative, after the publication of the 2011 FDA public health notification.

Ms. Ducat saw her doctor twice about the same problems of pain with intercourse and her husband feeling scratching during intercourse and had two remedial surgeries in 2004 and 2005 to remove eroded mesh. [Pls.' Mem. 2-3; Pezzella Dep. 84:11-24]. In 2004, Dr. Pezzella told Ms. Ducat that the mesh had eroded and was protruding through Ms. Ducat's vaginal wall such that surgery was required to excise it. [Pezzella Dep., at 66:19-25]. One year later, Ms. Ducat returned to the same doctor with the same complications and once again Dr. Pezzella found mesh protruding through Ms. Ducat's vaginal wall, which required surgery to excise it. [Id. at 81:7-11]. In that 2005 appointment, Dr. Pezzella outlined for Ms. Ducat that there were "problem[s]

6

with keeping the mesh in place," and recommended the removing the entirety of the mesh. [Id. at 82:2-11]. Dr. Pezzella subsequently removed all mesh that was visible and safely removable. [Id. at 84:11-24].

Multiple surgeries addressing the same medical device can be enough to put a plaintiff on notice that the device is the cause of their harm. DeLellis, 2021 U.S. Dist. LEXIS 144441, at *13. In DeLellis, the court granted the defendant's motion to dismiss due to the running of the statute of limitations, finding it was "unreasonable to believe that a patient who had as many mesh revision procedures as DeLellis would have no reason to suspect a possible connection between her complications and the mesh products." DeLellis, 2021 U.S. Dist. LEXIS 144441, at *13. While DeLellis had several more surgeries than Ms. Ducat, other courts considering surgical mesh products have held that just two or three remedial surgeries involving problems with the same product are enough to put a plaintiff on notice. See, e.g., Adams v. Am. Med. Sys., Inc., 705 Fed. Appx. 744, 745 (10th Cir. 2010) (Plaintiff "knew, or should have known when she was told she had to undergo a second operation to remove part of the mesh sling that she had been harmed by the sling."); Cutter v. Ethicon, Inc., No. 5:19-443-DCR, 2020 U.S. Dist. LEXIS 4016, at *6 (E.D. Ky. Jan. 9, 2020) (cause of action accrued after three corrective surgical procedures from mesh complications).

Both DeLellis and Ms. Ducat assert that they were never explicitly told by their medical providers that the mesh caused their harm, but that is not required for notice. The DeLellis court found it was unreasonable for DeLellis to claim that she would have "no reason to suspect a possible connection between her complications and the mesh products unless her doctor specifically told her of the connection" given that she had multiple surgeries involving the mesh. DeLellis, 2021 U.S. Dist. LEXIS 144441, at *13. Similarly, given the two remedial surgeries to

remove the mesh here, it is unreasonable for Ms. Ducat to assert that she was not on notice because her doctor did not identify the mesh as the direct cause of her health problems.

Furthermore, there is a difference between a doctor failing to pinpoint a medical device as a cause of a plaintiff's injuries and a doctor attributing a plaintiff's injuries to some other preexisting cause. In this respect, the instant case differs from the situation in Stark v. Johnson & Johnson where the plaintiff was told that the complications from her pelvic mesh surgery were potentially due to her Ehlers-Danlos syndrome (EDS). 10 F.4th 823, 830 (7th Cir. 2021). Not only was Stark's EDS completely unrelated to her need for a pelvic mesh device, but a known complication of EDS is poor healing and post-surgical issues. Id. In Stark the court denied summary judgment for the defendant, holding that a reasonable jury could find the plaintiff believed her harm was caused by her EDS and thus she was not on notice that the product was the cause of her harm. Id. at 832. While Ms. Ducat was originally implanted with the Gynemesh for structural support after a hysterectomy and paravaginal repair, Ms. Ducat had no such unrelated preexisting condition like EDS that her doctors indicated could be the cause of her symptoms of pelvic pain and her husband's reports of scratching during intercourse. [See Pls.' Mem. at 2-3].

Additionally, although Dr. Pezzella stated that there are other potential causes for mesh erosion besides a product defect, [id.], the standard for notice in a products liability case is not notice of the *defect*, it is notice that the *product* is the cause of plaintiff's harm. Fidler, 714 F.2d at 199. Dr. Pezzella stated, "you can have a mesh erosion due to the fact that there was either a disruption of the repair; a thinning of the vaginal mucosa; breakdown, you know, between the two layers in some way, shape or form; or the way the mesh, perhaps, could have been placed." [Pezzella Dep. 67:14-20].  While each of these causes of erosion are alternatives to a defect in

the mesh causing Ms. Ducat's injuries, each alternative cause requires vaginal mesh—the product—to have been implanted in the first place.

The Court finds it unreasonable to believe that a patient in Ms. Ducat's situation had no reason to suspect a possible connection between her harm and the subject of her revision surgeries – the Gynemesh. By 2005, Ms. Ducat had experienced two instances of medical complications involving the same product that was implanted in her body—complications which required surgical intervention to address. Gynemesh was the common denominator in both circumstances. It is also unreasonable to believe that Ms. Ducat did not or should not have known that the harm she was suffering could be related to that product after her second surgery in 2005.

Alternatively, Ms. Ducat had reason to be on inquiry notice when the FDA published the July 2011 public health notification warning of complications from pelvic mesh. While the original October 2008 FDA notification was addressed to healthcare providers, the July 2011 supplemental notification was addressed to both healthcare providers and patients who had received surgical mesh. [See 10.20.08 FDA POP and SUI Notice, ECF No. 76, Ex. L; 7.13.11 FDA POP Notice, ECF No. 76, Ex. M]. In fact, the July 2011 notification included reference to the exact complications that Ms. Ducat had been experiencing in 2004 and 2005: pelvic pain, groin pain, and pain with intercourse. [7.13.11 FDA POP Notice; Pezzella Dep. 66:19-21, 79:19-25, 80:9-12 (describing Ms. Ducat's symptoms)]. Ms. Ducat may not have received actual notice from the FDA notification, but the law does not require actual notice. Ms. Ducat's multiple surgeries alone were enough to establish that Gynemesh was the likely cause of her harm, and thus Ms. Ducat had a duty to discover from legal, scientific, and medical communities whether her theory of causation is supportable and whether it supports a legal claim. See Fidler, 714 F.2d

at 199. Certainly, the 2011 FDA patient and provider notification about pelvic mesh complications is the type of notice that Ms. Ducat had a duty to discover.

Making all inferences in favor of the plaintiff, a reasonably prudent person in Ms. Ducat's position would have knowledge or sufficient notice that she was harmed and that her harm was caused by the Gynemesh implanted in her body at least by the time of the June 2005 surgery. Thus, Ms. Ducat was on notice and the three-year statute of limitations for Massachusetts tort actions began running on June 6, 2005. This would make Ms. Ducats suit untimely by twelve years.

Alternatively, a reasonably prudent person in Ms. Ducat's position would have knowledge or sufficient notice that she was harmed and that her harm was caused by the Gynemesh implanted in her body at least by the publication of the second FDA notice in July 2011. Thus, Ms. Ducat was on notice and the three-year statute of limitations for Massachusetts tort actions began running on July 13, 2011. This would make Ms. Ducat's suit untimely by six years. Accordingly, the Court finds that under either scenario, Ms. Ducat's suit was untimely.

**V.    Conclusion**

As the Court finds that all of Plaintiffs' claims are barred by the statute of limitations, it need not address Defendant's other grounds advanced for summary judgment. For the reasons stated above and on the record, Defendant's Motion for Summary Judgment is GRANTED and the case is DISMISSED.

**SO ORDERED.**

**Dated: October 27, 2023**

   /s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge